# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

William Peterson,

                Plaintiff,

v.

Jerry Wallace, Creative Real
Estate.Net, and Steven V. Sunderman,

                Defendants.

Civil No. 08-1126 (DWF/AJB)

**MEMORANDUM
OPINION AND ORDER**

---

Michael R. Docherty, Esq., Attorney at Law, PLLC, and Richard J. Gerace, Esq., counsel for Plaintiff.

Defendant Jerry Wallace, *pro se*.

Creative Real Estate.Net, unrepresented.

Tina R. Mills, Esq., Law Firm of Tina R. Mills, LLC, and James G. Ryan, Esq., Ryan Law Firm, counsel for Defendant Steven V. Sunderman.

---

## INTRODUCTION

This matter is before the Court upon the motion of Defendant Steven V. Sunderman ("Sunderman") to dismiss the complaint of Plaintiff William Peterson ("Peterson"). Sunderman argues that this Court lacks personal jurisdiction over him. For the reasons set forth below, the Court grants Sunderman's motion to dismiss.

## BACKGROUND

This case concerns an alleged real estate investment scheme. Peterson alleges that Defendant Jerry Wallace ("Wallace"), Sunderman, and Defendant Creative Real

Estate.Net ("Creative") perpetrated the scam and took $500,000 from him.  According to Peterson, he and Wallace were business associates, Wallace introduced Peterson to Sunderman in connection with the alleged fraud, and Creative is a company owned and controlled by Wallace.

Peterson alleges that he contacted Wallace in May 2005 about a real estate investment opportunity in Kentucky, about which Peterson read in a newspaper, and asked Wallace to investigate.  The investment related to the Doe Valley Golf & Country Club in Brandenburg, Kentucky (the "Doe Valley Property").  Wallace reported he was familiar with the Doe Valley Property and thought it might be a good investment. Peterson traveled to Kentucky to meet with Wallace and, while there, he met Sunderman, whom Wallace introduced as Wallace's partner.  Peterson, Wallace, and Sunderman met with a representative of the Doe Valley Property's owners and toured the Doe Valley Property, after which the three of them had lunch and decided to pursue the investment.

Wallace was to negotiate the purchase, and he represented that he was doing so until early June 2005.  At that time, however, Wallace told Peterson he was discontinuing negotiations and that the "deal [was] dead" due to infighting among the property's owners.  (Doc. No. 1 ¶ 24.)  On June 15, 2005, Wallace called Peterson and informed him that the deal was back on because the owners had resolved their differences and were ready to move forward.

Wallace represented to Peterson that the Doe Valley Property's owners wished to sell 488 lots for a total of $1,725,000 and that the sale needed to close quickly.  Wallace outlined a plan under which Peterson would invest $1,000,000, Wallace and his partners

would invest $225,000, and the remaining $500,000 would be financed by the sellers.

Peterson indicated he could only raise $500,000, but stated that he would contact a friend

to raise the other $500,000.  Peterson alleges he contacted a friend in Minneapolis,

Ronald Olsen ("Olsen"), to raise this additional money, but Olsen wanted to conduct a

due diligence review of the investment.  Wallace, however, represented that there was no

time for such a review because the sale had to close on June 24, 2005, and also

represented that he had another partner who could contribute $500,000 so that the deal

could close on time.  Wallace subsequently contacted Peterson and directed him to wire

$500,000 to an escrow account.

Peterson wired the $500,000 as directed.  Wallace issued Peterson a note granting

him a 42% interest in the venture.  Over the next few months, Peterson and Wallace

discussed various plans regarding the Doe Valley Property, including selling or trading

the lots to a home builder.  Ultimately, Wallace told Peterson that the home builder had

proposed a trade for all 488 lots; in exchange for the lots, the investors would receive five

houses in Ohio and eight condominiums in Las Vegas (the "Hard Rock Properties"), as

well as an account with $5,600,000 in escrowed funds.  Peterson agreed to this exchange,

and Wallace subsequently represented that the exchange had occurred.  Wallace also told

Peterson they had already earned $71,000 in interest on the escrow account.

In August or September 2005, Peterson decided to visit Las Vegas to view the

Hard Rock properties.  Wallace indicated he would send a package regarding the Hard

Rock Properties to Peterson at his hotel in Las Vegas, but the package never arrived and,

without documents identifying the Hard Rock Properties, Peterson was unable to view

them.  Peterson was unable to contact Wallace while in Las Vegas and he ultimately left without viewing the Hard Rock Properties and returned to Minnesota.

In late September, Wallace contacted Peterson and claimed that Federal Express lost the package sent to him in Las Vegas.  Wallace represented he had sent another package to Minnesota, but this package failed to arrive as well.  Peterson attempted to contact Wallace when he did not receive the second package, but was unable to reach Wallace until October 18, 2005.  At that time, Wallace told Peterson he had transferred the money in the escrow account, now $5,671,000, from US Bank because he was concerned about the bank's solvency.  He indicated that he transferred the funds to Bank of America, but that Bank of America placed the funds with a division of Refco, a commodities trading firm that had filed a petition for bankruptcy.  Wallace indicated that the money was frozen due to the bankruptcy case.

Peterson looked into Refco's bankruptcy and decided Wallace's story did not make sense; he attempted to contact Wallace but was unable to reach him.  Peterson called Sunderman.[1]  According to Peterson, Sunderman stated that the lots in Kentucky had been purchased as promised but that Wallace handled all of the paperwork. Sunderman also stated that the lots were exchanged for the houses, condominiums, and the escrowed funds, as represented by Wallace, and that $5,671,000 was in an account with Bank of America.  Peterson told Sunderman that he was lying, demanded the return of his money, and threatened to pursue criminal charges against Sunderman and Wallace.

---

[1]     The Complaint states that Peterson called Sunderman on October 21, 2007, but all of the other events in the case are alleged to have occurred in 2005, suggesting that this may be a typographical error.

Peterson alleges Sunderman indicated he would contact Wallace and have Wallace respond to Peterson.

According to Peterson, Wallace then contacted him and admitted that no properties had ever been purchased, and there had not been a trade for houses, condominiums, and funds in a bank account.  Wallace admitted that he used Peterson's money for other real estate deals.  Peterson alleges that Wallace lied about this as well; he alleges that Wallace invested some of the money in a foreign currency trading account with Refco.  Peterson has pursued claims against Wallace and Sunderman to recover his funds, but alleges he has been able to recover only $194,000 of his investment.

In the motion before the Court, Sunderman argues that this Court lacks jurisdiction over him.  Sunderman contends that he has insufficient contacts with Minnesota to permit suit against him here.  Peterson argues that Sunderman directed his activities toward Minnesota and also that Wallace's contacts with Minnesota can be attributed to Sunderman because the two were involved in a conspiracy.

## DISCUSSION

### I.       Standard of Review

When a defendant challenges personal jurisdiction, the plaintiff has the burden to show that personal jurisdiction exists.  *Burlington Indus., Inc. v. Maples Indus., Inc.*, 97 F.3d 1100, 1102 (8th Cir. 1996) (citing *Gould v. P.T. Krakatau Steel*, 957 F.2d 573, 575 (8th Cir. 1992)).  To survive a motion to dismiss for lack of personal jurisdiction, however, the plaintiff need only make a prima facie showing of personal jurisdiction over the defendant.  *Digi-Tel Holdings, Inc. v. Proteq Telecomms. (PTE),*

*Ltd.*, 89 F.3d 519, 522 (8th Cir. 1996) (citing *Northrup King Co. v. Compania Productora Semillas Algodoneras Selectas, S.A.*, 51 F.3d 1383, 1387 (8th Cir. 1995)).

When considering whether personal jurisdiction exists, the court may consider matters outside the pleadings; "the court may inquire, by affidavits or otherwise, into the facts as they exist." *Stevens v. Redwing*, 146 F.3d 538, 543 (8th Cir. 1998) (quoting *Land v. Dollar*, 330 U.S. 731, 735 n.4 (1947)).  For the purposes of determining whether the plaintiff has made a prima facie showing of personal jurisdiction, the court must view the evidence in the light most favorable to the plaintiff and resolve all factual conflicts in the plaintiff's favor. *Digi-Tel*, 89 F.3d at 522 (citing *Dakota Indus., Inc. v. Dakota Sportswear, Inc.*, 946 F.2d 1384, 1387 (8th Cir. 1991)).

In determining whether a court has personal jurisdiction over a non-resident defendant, a court must ordinarily satisfy both the requirements of the state long-arm statute and of federal due process. *Id.* (citing *Northrup King*, 51 F.3d at 1387).  The Minnesota long-arm statute extends jurisdiction to the maximum limit consistent with due process, and therefore a court in Minnesota need only evaluate whether the requirements of due process are satisfied. *Wessels, Arnold & Henderson v. Nat'l Med. Waste, Inc.*, 65 F.3d 1427, 1431 (8th Cir. 1995).  When analyzing most personal jurisdiction questions in Minnesota, courts may simply apply the federal standards. *Valspar Corp. v. Lukken Color Corp.*, 495 N.W.2d 408, 411 (Minn. 1992).

Federal due process requires that a defendant have "certain minimum contacts" with the forum state such that "maintenance of the suit does not offend traditional notions of fair play and substantial justice." *Int'l Shoe Co. v. Wash.*, 326 U.S. 310, 316 (1945)

(internal quotations omitted).  The defendant's conduct and connection with the forum state must be such that the defendant should reasonably anticipate being haled into court there.  *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980).  It is essential in each case that the defendant has purposefully availed himself of the privilege of conducting activities within the forum state, thus invoking the benefits and protections of its laws.  *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985) (quoting *Hanson v. Denckla*, 357 U.S. 235, 253 (1958)).

A court may use one of two different analyses to determine whether the defendants' contacts with the forum state establish personal jurisdiction.  *Epps v. Stewart Info. Servs. Corp.*, 327 F.3d 642, 648 (8th Cir. 2003).  In a general jurisdiction case, a defendant maintains such "continuous and systematic" contacts with a state that it becomes subject to the jurisdiction of that state's courts for any purpose.  *Morris v. Barkbuster, Inc.*, 923 F.2d 1277, 1281 (8th Cir. 1991) (quoting *Helicopteros Nacionales de Columbia v. Hall*, 466 U.S. 408, 414 n.9, 416, 418–19 (1984)); *Valspar*, 495 N.W.2d at 411.  Specific jurisdiction, on the other hand, requires that the defendant has "purposely directed" its activities at residents of the forum and that the litigation results from alleged injuries that "arise out of or relate to" those activities.  *Wessels*, 65 F.3d at 1432 (quoting *Burger King*, 471 U.S. at 472).

Regardless of which analysis is used, the Eighth Circuit applies a five-factor test in determining whether the exercise of personal jurisdiction would pass constitutional muster:  (1) the nature and quality of defendant's contacts with the forum state; (2) the quantity of contacts; (3) the source and connection of the cause of action with those

7

contacts; and, to a lesser degree, (4) the interest of the forum state; and (5) the

convenience of the parties.  *Wessels*, 65 F.3d at 1432.  The first three factors are of

primary importance, while the last two are "secondary factors."  *Minn. Mining & Mfg.*

*Co. v. Nippon Carbide Indus. Co., Inc.*, 63 F.3d 694, 697 (8th Cir. 1995).  The third

factor distinguishes between specific and general jurisdiction.  *Digi-Tel*, 89 F.3d at 523

n.4 (citing *Wessels*, 65 F.3d at 1432 n.4).

## II.      Personal Jurisdiction Over Sunderman

Sunderman is a resident of Ohio and has been to Minnesota only once, when he

played in a baseball tournament as a teenager.  He owns no property in Minnesota, has no

bank accounts or other money in Minnesota, and has never solicited or done business in

Minnesota.  If jurisdiction lies in this case, it does so on the basis of specific, rather than

general, jurisdiction.  The Court, therefore, must determine whether Sunderman

purposely directed his activities at residents of Minnesota and whether the present

litigation results from alleged injuries that arise out of or relate to those activities.

Peterson alleges two contacts between himself and Sunderman related to the

alleged fraudulent transaction.  First, he alleges he met Sunderman in Kentucky to tour

the Doe Valley Property, at which time Wallace referred to Sunderman as his partner.

Second, Peterson alleges that he called Sunderman for information after he came to

believe that the investment deal was a scam and alleges that Sunderman lied to him about

the property exchange.  Sunderman received this call from Peterson in Ohio.  All of

Sunderman's activities in connection with the alleged fraud occurred outside Minnesota.

Peterson alleges that these contacts are of sufficient quantity and nature to give rise to

personal jurisdiction over Sunderman in Minnesota, however, because he alleges Sunderman was part of a fraudulent scheme, the brunt of the effect of which was felt by Peterson in Minnesota.

The Supreme Court announced the "effects test" for personal jurisdiction in *Calder v. Jones*, 465 U.S. 783 (1984). In that case, a professional entertainer, Shirley Jones, sued two reporters employed by the *National Enquirer* over a story published by the magazine stating that Jones drank so heavily she was unable to fulfill her contractual obligations. *Calder*, 465 U.S. at 789 n.9. The Supreme Court concluded that personal jurisdiction over the two reporters existed in California because they had directed their intentional tortious actions toward California. *Id*. at 789. The Supreme Court stated that the reporters knew that Jones would feel the "brunt of that injury" in California, where she lived and worked, and where the *National Enquirer* had its largest circulation. *Id*. at 789-790.

The Eighth Circuit applied the *Calder* test in *Dakota Industries*, 946 F.2d 1384, in determining that a California corporation could be sued for trademark infringement, an intentional tort, in South Dakota. There, the defendant California corporation made clothing with an allegedly infringing mark that was available for sale in South Dakota. *Dakota Indus.*, 946 F.2d at 1391. Though the company contended that it did not directly ship the goods there, it was aware that it sold goods to chains with retail outlets in South Dakota. *Id*. The court concluded that the defendant had not merely placed goods into the stream of commerce because the merchadising of the offending clothes was not a

"mere isolated act" and that the cause of action asserted flowed from commercial ties to South Dakota. *Id*. at 1390.

In another case, *Finley v. River North Records, Inc.*, 148 F.3d 913 (8th Cir. 1998), an Arkansas concert promoter sued a Tennessee record company and booking agent for fraudulent misrepresentation related to a concert to be held in Arkansas and the record company challenged jurisdiction. The court concluded that jurisdiction existed under the *Calder* test. An employee of the record company sent promotional materials regarding the four artists who were to perform and made phone calls to the concert promoter in Arkansas. *Finley*, 148 F.3d at 915. The court concluded that the promotional materials were sent to Arkansas with the knowledge that they would be used commercially to promote the concert. *Id*. at 916. The court also stated that the recording company knowingly misrepresented that one artist would appear when she would not and misrepresented the existence of a band it said would perform at the concert; therefore, the company engaged in "fraudulent conduct, intended to induce commercial activity within the forum state." *Id*.

Further, in *Oriental Trading Company, Inc. v. Firetti*, 236 F.3d 938 (8th Cir. 2001), the Eighth Circuit held that minimum contacts existed for a suit against Virginia defendants in Nebraska. The defendants operated a company that sold pencils and crayons and the defendants negotiated a contract to sell goods to the plaintiff for delivery in Nebraska. *Oriental Trading*, 236 F.3d at 941. The defendants made numerous phone calls and sent faxes to Nebraska in connection with a scheme to charge the plaintiff for customs fees never assessed upon the shipment. *Id*. at 943. The court concluded that the

defendants engaged in intentional tortious acts directed at residents of Nebraska and that the brunt of the effect of the scheme was felt there.  *Id*.

The key similarity between each of these cases is the allegation of an intentional tort related to activity, particularly commercial activity, in the forum state and where the brunt of the impact of the injury is also felt in the forum state.  The facts of this case do not meet this standard.  Here, Peterson lives, and suffered financial harm, in Minnesota. The alleged scheme related to real estate in Kentucky and a trade of that property for houses in Ohio and condominiums in Nevada.  Sunderman's activities not only occurred outside Minnesota, but also were directed to commercial or other activity outside Minnesota.

Peterson asserts that the telephone call he placed to Sunderman is a contact with Minnesota in which Sunderman directed intentionally fraudulent and tortious statements to him in Minnesota, satisfying the *Calder* effects test.  Generally, sending letters into or making telephone calls to a forum state is insufficient, by itself, to satisfy due process and confer jurisdiction.  *Mountaire Feeds, Inc. v. Agro Impex, S. A.*, 677 F.2d 651, 656 (8th Cir. 1982).  In this case, Sunderman *received* a telephone call from Minnesota, rather than placing one to Minnesota, making the contact less significant for due process purposes.  Peterson nonetheless contends that this case is like *Brainerd v. Governors of the Univ. of Alberta*, 873 F.2d 1257 (9th Cir. 1989).  In *Brainerd*, an official at a Canadian university was alleged to have made disparaging contacts about the plaintiff during a phone call to him initiated by the plaintiff's Arizona employer.  The court concluded jurisdiction existed based on this telephone call, notwithstanding the absence

of other contacts for the foreign defendants and even though the defendants did not initiate the contact.  *Brainerd*, 873 F.2d at 1259.

Sunderman, however, asserts this case is similar to *Stangel v. Rucker*, 398 N.W.2d 602, 605 (Minn. Ct. App. 1986).  There, the plaintiff alleged that defendants provided care to his son in Louisiana after the child was removed unlawfully from the state by plaintiff's ex-wife.  *Stangel*, 398 N.W.2d at 605.  The plaintiff further alleged that one of the defendants lied to him in a telephone call plaintiff placed to the defendant in Louisiana, stating that his son was not there even though the plaintiff could hear the child in the background.  *Id*.  The court held that providing care for the child in Louisiana had nothing to do with Minnesota and did not constitute a contact with the forum.  *Id*.  In addition, the court stated that the phone call, placed by plaintiff, in which the defendant allegedly lied to him, was a weak basis for jurisdiction.  *Id*.  In all, the court concluded that there was no basis for jurisdiction over the defendants.

This Court concludes that this case is more like *Stangel* than *Brainerd*.  In *Brainerd*, the defendant made disparaging remarks regarding the plaintiff's employment to his employer in the forum state, and the court held that the defendant knew that injury and harm resulting from his comments would be felt in the forum state where the plaintiff planned to live and work.  *Brainerd*, 873 F.2d at 1259.  Therefore, in *Brainerd*, the defendant purposefully directed his tortious activities toward the forum state.  In *Stangel*, the defendant resided and received a phone call in a state other than the forum state, and she allegedly lied about activities occurring outside the forum state.  Her statements were not directed toward the forum state although she was speaking to a forum resident.

Similarly, the subject of Sunderman's alleged lies and of the fraudulent transaction was the purchase and trade of properties outside the forum state.

Further, even if Sunderman intentionally lied to Peterson in this telephone call, such lies do not sufficiently connect Sunderman to an intentional tort directed toward Minnesota.  In *Kopperud v. Agers*, jurisdiction existed over an Arizona defendant who engaged in activities intended to induce Minnesota residents to invest in land development in Arizona; the plaintiffs sued alleging that real estate mortgaged in connection with the transactions was insufficient to secure the notes issued.  312 N.W.2d 443 (Minn. 1981).  In *Kopperud*, the defendant directed his activities toward obtaining a commercial benefit in Minnesota.  *Id*. at 445.  The defendant met with the broker who sold the securities to Minnesota residents and discussed with him how to transact the sales; he knew the broker was selling notes and mortgages in Minnesota and was personally involved in determining the amounts and drafting the note and mortgage documents, and he corresponded with two Minnesota attorneys regarding probate treatment of the mortgages.  *Id*.  The court concluded that the defendant's contacts with Minnesota were not isolated or unforeseeable, but that he purposefully availed himself of the state to defraud Minnesota investors and was instrumental in setting in motion and perpetuating a fraudulent scheme.

*Kopperud*, however, does not make every intentional tort that injures a Minnesota resident a basis for jurisdiction.  *Id*. (stating that Minnesota's "long-arm statute  . . . does not confer jurisdiction whenever a tort is committed by a nonresident.").  Sunderman's contacts with Peterson and role in the alleged fraud, and the fraud itself, are far more

tangentially related to Minnesota than the fraud considered in *Kopperud*. Even construing the facts in the light most favorable to Peterson, Peterson knew that Sunderman was making a false statement and told him so in that same conversation. Peterson, therefore, does not allege that Sunderman actually succeeded in misleading him during this telephone call. Unlike the defendant in *Kopperud*, Sunderman's contact with Minnesota is isolated and any connection between Sunderman and Minnesota is too "random, fortuitous or attenuated" to give rise to jurisdiction here. *Burger King*, 471 U.S. at 475.

Peterson also argues that jurisdiction exists over Sunderman because Sunderman and Wallace were engaged in a conspiracy to defraud Peterson.[2] Peterson, therefore, asserts that Wallace's activities can be attributed to Sunderman for jurisdictional purposes.

Minnesota has recognized conspiracy-based personal jurisdiction. *Hunt v. Nevada State Bank*, 172 N.W.2d 292 (Minn. 1969). In *Hunt*, the court concluded long-arm jurisdiction existed to permit a suit in Minnesota when the defendants, three of whom were Minnesota residents, were alleged to have conspired to convert the assets of an insurance company whose policy holders were primarily Minnesota residents. *Id*. at 312-313. The court noted that Minnesota was the only state that had significant contacts

---

[2]     In addition to the contacts between Peterson and Sunderman noted above, Peterson argues that Sunderman was involved in the alleged conspiracy because he wrote checks that directed Peterson's investment funds out of the account where Wallace placed them and to an associate of Wallace's. Sunderman argues that he simply issued checks at Wallace's direction as a clerical task without any knowledge of Wallace's fraudulent activities. This activity also occurred outside Minnesota, and the Court concludes that this allegation is not determinative of the jurisdictional question presented.

with all of the defendants and that the defendants intentionally set in motion financial actions that injured Minnesotans. *Id*. at 312. The court remarked that it was undisputed that the great majority of the defendants had been present for an important meeting in St. Paul, Minnesota, but further stated that "[o]nce participation in a tortious conspiracy - the effect of which is felt in this state – is firmly established, actual physical presence of each of the alleged conspirators is not essential to a valid assertion of jurisdiction." *Id*. at 311.

The Court concludes that conspiracy-based jurisdiction does not apply here. First, the contacts between the conspirators in *Hunt* and Minnesota were more substantial than the contacts between Wallace and Sunderman and the state of Minnesota. Though actual physical presence of each of the conspirators in Minnesota may not be required, some of the conspirators in *Hunt* did have actual physical presence here and engaged in acts related to the conspiracy within the state. 172 N.W.2d at 296, 311, 312; *see also Remmes v. Int'l Flavors & Fragrances, Inc.*, 389 F. Supp. 2d 1080, 1093-96 (N.D. Iowa 2005) (discussing cases and stating that asserting jurisdiction based on conspiracy requires a showing that: (1) a conspiracy existed; (2) the non-resident participated in or joined the conspiracy; and (3) an overt act was taken in furtherance of the conspiracy within the forum's borders). This is not a case in which a non-resident defendant directed the activities of an agent within the forum, thereby causing harm within the state, but seeks to shield himself because his own activities were extra-territorial. In this case, neither Wallace nor Sunderman was physically located here, nor did either of them take an act in Minnesota in furtherance of the alleged conspiracy. Even Wallace, whose role in the

conspiracy involved many more contacts with Peterson, only made telephone calls to Peterson in Minnesota from outside the state.

Further, a showing of minimum contacts is not unnecessary when a conspiracy with Minnesota effects is alleged and the allegation of such a conspiracy does not satisfy the minimum contacts test itself. *Stangel*, 398 N.W.2d at 606. The connection with Minnesota in this case is that Peterson lives here and sent money from Minnesota to Wallace at Wallace's request to complete the purchase of the Doe Valley Property. This is simply too insubstantial a basis to conclude that Wallace and Sunderman directed their activities at Minnesota sufficiently to constitute purposeful availment.

The Court, therefore, concludes that the first three factors of the test used to determine whether personal jurisdiction exists weigh against jurisdiction. In addition, the Court finds that the final two factors do not tip the balance in the other direction. Though Minnesota has an interest in providing a forum for residents of the state, Minnesota's interest is muted because the transactions Peterson alleges occurred took place outside the state. Further, the convenience of the parties does not weigh in favor of jurisdiction here. Though Peterson would find Minnesota a more convenient place to litigate, the other parties would not.

The Court concludes that Peterson has failed to make a prima facie case that Sunderman has minimum contacts with Minnesota, such that he purposefully availed himself of Minnesota and could reasonably expect to be haled into court here. Therefore, this Court lacks personal jurisdiction over Sunderman.

**CONCLUSION**

Though Peterson may have a cause of action against Sunderman in connection with this transaction, such a suit may not lie in Minnesota because Sunderman lacks the requisite minimum contacts with this state.  Therefore, Sunderman's motion to dismiss is granted.

Accordingly, **IT IS HEREBY ORDERED** that:

1.      The Motion to Dismiss for Lack of Personal Jurisdiction of Defendant Steven V. Sunderman (Doc. No. 16) is **GRANTED.**

2.      The Complaint (Doc. No. 1) is **DISMISSED WITHOUT PREJUDICE** as to Defendant Sunderman.


Dated:  December 10, 2008              s/Donovan W. Frank
                                       DONOVAN W. FRANK
                                       Judge of United States District Court